RECEIVED
IN ALEXANDRIA, LA.

FEB 1 3 2014

TONY R. MOORE, CLERK
          DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

WILLARD ALLEN                          CIVIL ACTION NO. 09-0218

-vs-                                              JUDGE DRELL

BURL CAIN, WARDEN                 MAGISTRATE JUDGE KIRK

## RULING ON PETITION FOR WRIT OF HABEAS CORPUS AND MOTION FOR SUMMARY JUDGMENT

Before the Court is Willard Allen's petition for writ of habeas corpus (Doc. 1), and his motion for summary judgment (Doc. 27) as to one ground for relief. The Magistrate Judge, in separate Reports and Recommendations, suggested both of these be denied.   (Doc. 16, recommending denial of petition; Doc. 33, recommending denial of motion for summary judgment).  For the reasons given below, and in a separate judgment issued this date, these recommendations are PARTIALLY ADOPTED subject to the following modifications, such that the petition and motion will both be GRANTED, solely on the limited basis set forth following.

I.   **Summary**

Petitioner was convicted of first degree murder in a one-day trial in Natchitoches Parish, Louisiana in 1994.  The jury recommended he be sentenced to death after a one-day penalty phase; the trial judge concurred and entered

judgment.  Petitioner appealed as of right to the Louisiana Supreme Court, which upheld the conviction.[1]  After exhausting his administrative and state court post-conviction remedies,[2] Petitioner filed the present petition.

In his habeas application, Petitioner raises seventeen grounds for overturning his conviction.  All of these are addressed at length in the Magistrate Judge's Report & Recommendation, which rejects them all.  (Doc. 16).  We adopt most of this analysis.  However, one aspect of Petitioner's trial leads us to disagree with the Magistrate Judge's analysis of two of these grounds, and ultimately to grant the writ and the motion for summary judgment.[3]

Specifically, we find the state trial court allowed an avowedly biased juror, Mr. Chester, to be seated on Petitioner's jury, through a fatally defective voir dire. The juror, Mr. Chester, was never otherwise rehabilitated, nor did he ever indicate he would weigh the evidence and/or decide the case fairly and impartially.  Mr. Calhoun, Petitioner's attorney, did not challenge Mr. Chester, either for cause or with one of his peremptory challenges, and the trial court seated him on the jury.

---

[1]  State v. Allen, 682 So.2d 713 (La. 1996).  His trial attorney, Mr. Calhoun – a relatively new attorney at the time, the adequacy of whose representation is challenged here – handled the direct appeal.

[2]  The Jones Walker law firm was appointed by the Louisiana Supreme Court to assist Petitioner in his post-conviction proceedings.  (Doc. 1-1, Exhibit S.)  With the Federal Public Defender, they have continued to handle the present proceedings, with the Court's appreciation.

[3]  As described below, this matter was the topic of Petitioner's motion for summary judgment (Doc. 27), a separate Report and Recommendation suggesting denial of that motion (Doc. 33), and an evidentiary hearing we held, pursuant to 28 U.S.C. § 2254(e)(2).  (Doc. 41, minutes of hearing; Doc. 42, hearing transcript).

The issue was never considered on appeal, as the appeal was handled by Petitioner's trial attorney, who did not raise it.

Accordingly, we find Petitioner's unreliable conviction cannot be the basis for criminal punishment, much less a sentence of death. As detailed below, he has met his burden to have that conviction vacated and for a new trial. His petition must therefore be GRANTED.

## II.   Background

Petitioner is presently in the custody of the State of Louisiana and incarcerated in the Louisiana State Penitentiary at Angola. Respondent is the warden of that penitentiary. Petitioner's writ of habeas corpus is sought pursuant to 28 U.S.C. § 2254. (Doc. 1).

Petitioner argues seventeen grounds for habeas relief. (Doc. 1, pp. 14-16). These are addressed comprehensively in the Magistrate Judge's Report and Recommendation, which recommends we deny them all. (Doc. 16). With the exception of the two grounds noted above – the violation of Petitioner's Sixth Amendment rights to an impartial jury and to adequate assistance of counsel – we ADOPT the Report and Recommendation in denying relief on the remaining grounds. Likewise, with the same exceptions, we find the Magistrate Judge's procedural background summary and statement of facts to be generally accurate.

As observed, Petitioner was represented by counsel, Mr. James Calhoun, at trial. Originally, two attorneys were appointed to represent Petitioner, but Mr.

Calhoun asked that the other attorney be dismissed,[4] apparently without
Petitioner's knowledge.   The trial court granted such motion on April 18, 1994.
(Court Record, Vol. 1 of 18, p. 7).  This action left Petitioner represented in a
serious, death penalty, case by an attorney who is alleged to have had little capital
case experience.  (Doc. 23, p. 1).

Petitioner was convicted of first degree murder for the killing of Herman
Ferguson in the early morning hours of September 7, 1993, during an armed
robbery of a night club where Mr. Ferguson was a patron.[5]  The phase of the trial
determining guilt lasted a single day, October 12, 1994, with Petitioner's defense
purportedly taking only one hour.  (Doc. 23, p. 1).  Petitioner had previously
confessed to the crime; over his objection, his confession was admitted into
evidence.  Petitioner now disavows the confession and protests his innocence,
claiming the evidence points to another individual.  We take no position on that
question here, as it is a matter unnecessary to this ruling.

As Petitioner's trial counsel, Mr. Calhoun also handled Petitioner's direct
appeal.  On appeal (of right), the Louisiana Supreme Court affirmed the judgment
and sentence on September 5, 1996.  State v. Allen, 682 So.2d 713 (La. 1996).  On

---

[4] Although we must make it clear that we have not considered it in this determination,
Mr. Calhoun's stated reasons for releasing co-counsel make for fascinating reading.
(See Doc. 15-2, pp. 3-4.)

[5] A full narrative of the case is given in the Report and Recommendation.  (Doc. 16, pp.
4-7).  It takes these facts verbatim from the Louisiana Supreme Court's opinion denying
Petitioner's direct appeal.  State v. Allen, 682 So.2d 713 (La. 1996).

4

September 30, 1996, Mr. Calhoun wrote to Petitioner that the Loyola Death Penalty Resource Center would seek a writ of certiorari in the United States Supreme Court. (Doc. 1-1, p. 1). No such writ was filed within the ninety days permitted by United States Supreme Court Rule 13.

## III.  **State Habeas Proceedings**

On September 28, 2007, Petitioner filed his First Amended Petition for Post-Conviction Relief with the Tenth Judicial District Court, Natchitoches Parish, Louisiana, raising the grounds for relief stated in the present petition and requesting an evidentiary hearing. (Doc. 1-2, pp. 1-103). That court denied the petition without such hearing on November 14, 2007. (Doc. 1-1, pp. 61-72). The court's reasoning with regard to the issue here is as follows, in full:

> In his first claim, the petitioner alleges that certain jurors were biased and had preconceived notions about the guilt or innocence of the petitioner. The petitioner has submitted several affidavits from several jurors that describe various aspects of the jury deliberations.

> The most egregious allegations come from the affidavit of James Chester. In his affidavit, [Mr. Chester] alleges that he (1) socialized with deputies of the Natchitoches Parish Sheriff's Office [the office that handled the murder investigation], (2) learned of information about the case prior to trial, (3) prejudged the case before testimony and evidence were received, (4) told other jurors that he spoke with deputies before the trial and that he believed the petitioner was guilty, and (5) heard another, unnamed juror state that the petitioner had been offered a plea bargain, which he declined. The petitioner claims these allegations of jury bias or tampering should nullify the jury's verdict.

> Louisiana Code of Evidence Article 606(B) significantly limits affidavit admissibility when used to impeach the validity of the jury's verdict. That statute provides:

**Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, *whether extraneous prejudicial information was improperly brought to the jury's attention.* Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes. [Italics added].

Therefore, only affidavit or witness testimony that concerns either outside influences or extraneous prejudicial information is admissible in this proceeding. It is well-settled that affidavits cannot normally be used as evidence to impeach their verdicts, as a contrary rule would "open the door for tampering with jurors and would place in it the power of a dissatisfied or corrupt juror to destroy a verdict." Uriegas v. Gainsco, 94-1400 (La. App. 3 Cir. 9/13/95), 663 So.2d 162. Therefore, "the affidavit of a juror cannot be admitted to show anything relating to what passed in the jury room during the investigation of the cause." Id. at 171.

First, the allegation that Mr. Chester socialized with deputies and told other jurors of his opinion does not involve outside influences. Communications among jurors, even when violative of the trial court's instructions, do not amount to "outside influences" or "extraneous judicial information." State v. Emanuel-Dunn, 03-0550 (La. App. 1 Cir. 11/7/03), 868 So.2d 75. Additionally, Mr. Chester states he received unspecified information regarding the case. It is impossible to determine whether or not this information was "prejudicial" without knowing what the information is, and even so, the law does not require jurors to enter deliberations with an entirely clean slate. State v. Fussell, 06-324 (La. App. 3 Cir. 9/27/06), 941 So.2d 109.

> Mr. Chester's claim in his affidavit that he prejudged the case does
> not qualify as an outside influence or extraneous prejudicial
> information so as to allow its admission under La. C.E. 606 (B). . . .

(Doc. 1-1, pp. 62-63).

As we discuss in greater detail below, we find that this state court both unreasonably misconstrued the matter before it, and unreasonably applied an incorrect rule of law to the situation.   Concretely, the main material for consideration here is not Mr. Chester's affidavit, but his actual voir dire answers. Petitioner squarely presented this point in his state court post-conviction petition. (Doc. 1-2, pp. 33-35).  However, the state court did not consider it, with the quote above regarding the affidavit being the only explanation given.  The Louisiana Code of Evidence rule against jurors as witnesses simply has no bearing on whether voir dire answers can be considered, and the state court was unreasonable to fail or refuse to address this problem on that basis.  Moreover, even the affidavit does not solely describe various aspects of the jury deliberations. Rather, it concerns Mr. Chester's voir dire answers and various sources of extraneous prejudicial information, including his conversations with the police detective witnesses, all on which a juror may offer later testimony.[6]  Finally, the

---

[6]  That such contacts are not circumscribed by Louisiana's jury shield law is seen in the very case to which the state court cites, State v. Emanuel-Dunn, 868 So.2d 75, 81-82 (La. App. 1 Cir. 2003) (refusing to admit juror testimony because, after "an exhaustive review of the voir dire examination," the court found no evidence in the record that the juror had collected any extraneous information, indicated he knew anything about the case prior to beginning deliberations, or that the juror otherwise "breached his duty as a juror" to decide the case solely on the evidence admitted and presented at trial).

state court ignored the entirety of the United States Supreme Court's jurisprudence framing the right to an impartial jury with the (correct) statement that "the law does not require jurors to enter deliberations with an entirely clean slate," and a citation to a not at all analogous Louisiana appellate court case, State v. Fussell, 941 So.2d 109 (La. App. 3 Cir. 2006), overruled on other grounds, 974 So.2d 1223 (La. 2008).  Specifically, in Fussell, no juror claimed to know anything about the case prior to trial or have any preconceptions regarding the defendant's guilt; rather, the challenges to those jurors were based on the jurors' "acquaintance" with various persons involved in the case. Id. at 137.  Defense counsel in Fussell also explored this possible bias with the jurors, and they all affirmatively stated their acquaintance would not affect their ability to be impartial. Id. As will be seen, by deciding the present case on such limited and inapplicable precedent, the state court resolved this issue contrary to clearly established federal law, and was unreasonable.

On December 14, 2007, Petitioner filed his application for a supervisory writ with the Louisiana Supreme Court, which denied the application.  Thereafter, having exhausted his state court remedies, Petitioner applied to this Court for the current writ of habeas corpus on February 9, 2009.[7]  We have spent much time considering and pondering the issues here only to come back time and again to

---

[7]  Petitioner also filed a previous habeas petition in this Court, which was dismissed for failure to have exhausted state remedies.  See Docket No. 97-cv-2281.

8

the same inevitable conclusion, giving all deference we could reasonably give to all state court process.

## IV. Jury Impartiality Generally

"Jury impartiality is a question of fact." Moore v. Johnson, 225 F.3d 495, 504 (5th Cir. 2000) (citations omitted). The factual findings of state courts are presumed correct and can only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

However, as discussed above, the state courts did not address this voir dire issue, either at trial or in post-conviction review. The trial court obviously was aware of the information presented during voir dire. A juror is also presumed impartial, and our analysis of the trial court's decision to sit the juror presumes that the trial court understood and correctly applied the relevant law in doing so. On the other hand, Petitioner's trial counsel did not object to the juror or explore the matter further. The trial court thus made no ruling on the issue raised here, and did not even address the voir dire answers or acknowledge the potential problem with them at trial. In post-conviction proceedings, the state court still did not address the same voir dire problem. Accordingly, we are the first Court to consider the fundamental constitutional violation here apparent, yet we do not do so lightly. Considering whether there might be some other remedy subsidiary to the reversal and retrial, we can find none as a matter of law. Still we remain

puzzled that such a fundamental constitutional error could occur and not, before now, have been the subject of substantial judicial analysis.

## V.    **Standard of Review**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to this proceeding as Petitioner filed his petition after the effective date of the AEDPA. See Nobles v. Johnson, 127 F.3d 409, 412-13 (5th Cir. 1997).  As amended by the AEDPA, 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has held that a state court decision which correctly identifies the governing legal rule but unreasonably applies it to the facts of a particular petitioner's case is enough for a federal habeas court to grant the writ. Wiggins v. Smith, 539 U.S. 510, 520 (2003).  However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous." Id.  Rather, the state court's application of federal law must have

10

been "objectively unreasonable." Id. at 520-21 (citing Williams v. Taylor, 529 U.S. 361, 409 (2000)).

We adopt and reiterate the Magistrate Judge's correct review of the law in this regard (Doc. 16 at p. 9):

> A federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. A federal court cannot grant habeas relief simply by concluding that the state court decision applied clearly established federal law erroneously; the court must conclude that such application was also unreasonable. Martin [v. Cain], 246 F.3d [471,] 476 (5th Cir. 2001), and cases cited therein.

> When a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief unless the harmlessness determination itself was unreasonable. Mitchell v. Esparza, 540 U.S. 12, 124 S. Ct. 7 (2003). In habeas proceedings, a federal court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710 (1993).FN3  Fry v. Pliler, 551 U.S. 112, 121–22, 127 S.Ct. 2321, 2328 (2007). The State bears the burden of persuasion as to the harmlessness of the error. Fry, 551 U.S. at 121 at n.3, 127 S.Ct. at 2328 [at] n.3.

> FN3 An error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict. Brecht, 507 U.S. at 631, quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S. Ct. 1239 (1946).

The state court's findings of fact are presumed to be correct, and a federal court on habeas only reviews the facts for clear and convincing error. 28 U.S.C. § 2254(e)(1). Nevertheless, the Supreme Court states in Miller-El v. Cockrell, 537 U.S. 322, 340 (2003):

> Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by [the] AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

Thus, while "the standard is demanding," it is "not insatiable." Miller-El v. Dretke, 545 U.S. 231, 240 (2005).

## VI.   The Voir Dire Testimony

The primary basis for our decision is the voir dire testimony of the juror, Mr. Chester.

### A.   *The prosecution's voir dire questioning of Mr. Chester*

The juror, Mr. Chester, was initially questioned by the prosecution.  The verbal exchange was, in relevant part, as follows:

Q:   Mr. Chester, where do you work?

A:   Uh, City of Natchitoches Fire Department and I'm enrolled in the Louisiana National Guard.

Q:   And you're acquainted with quite a few of the witnesses, I'm sure...

A:   Yeah.

Q:   ...because of your involved with...

A:   Most all of them.

Q:   Do you know any of them on a personal basis, visit with them often enough or friendly enough with them that you might not be able to wipe the slate clean as they get on the witness stand?

A:   Yeah, two (2) of them.

Q:     Who are those?

A:     Hardison and McGaskey.

Q:     Both of those witnesses are peripheral witnesses; they weren't primarily involved in the case.  Would that make a difference, you think?

A:     No, it shouldn't.

Q:     Okay.  Just because Eldred (Hardison) and McGaskey are involved, would you give any greater weight to the State's side than to the defense, just because they are testifying on behalf of the State.

A:     Uh, huh.  I don't know if I can answer that correctly, yes or no.  It'd kind of be...

Q:     There's no right or wrong answers.

A:     Right.

Q:     You're afraid that might cause you some concern?

A:     *No, uh, being that I work at the fire department, uh, we kind of tie knots with the law officials and you hear things and...*

Q:     Let me ask you this: do you know ... because of your knowledge of them, do you know more about this case than maybe other people?  Have you discussed the case with them?

A:     Well, from listening to a couple of firemen and members in the National Guard, yeah.  *I pretty much know everything.*

Q:     *Have you formed an opinion in the case based upon what you've heard, personal opinions?*

A:     *Well, I had until I got this summons and then, you know, just...*

Q:     *Do you feel like you could put your personal feelings or opinions of this case aside and start from scratch and decide the case based upon only the witness testimony and the other evidence that you might see or hear?*

A:     *Well, it'd just be, you know, it'd just be something else I'd have to put in the pot because I've heard so much over the year.*

Q:     *That's all of the questions I have.  I'll let Mr. Calhoun explore that, Your Honor.*

(Court Record, Vol. 3 of 18, pp. 166-67) (emphasis added).

To summarize, in these personal revelations, the prospective juror admitted he regularly interacted with law enforcement officials, including Hardison and McGaskey[8], "pretty much kn[e]w everything about the case," and had formed an opinion based on that prior knowledge.  Further, when asked if he could put aside his personal feelings or opinions of the case, start from scratch, and decide the case based only upon the witness testimony and other evidence presented at trial, he responded that the evidence presented at trial would "just be . . . something else I'd have to put in the pot because I've heard so much over the year."  Finally, the prosecutor acknowledged this bias when he concluded his questioning by noting he would let defense counsel "explore that" with the juror.

Respondent here disagrees with this interpretation.  It claims the prosecutor "by asking [Mr. Chester] the questions that he did . . . was trying to elicit some more information from Mr. Chester.   And [Mr. Chester] just didn't provide anything except these conclusory statements . . . because he didn't actually know anything." (Doc. 42, p. 23, lns. 6-10).  It contends, therefore, that "the responses

---

[8]  Hardison and McGaskey were both Sheriff's deputies.  Deputy McGaskey was arguably more than a peripheral witness.  He testified he was one of the deputies who searched Petitioner's car and found cash in the trunk, cash which the prosecution was trying to link into the crime charged.

14

of Chester were so conclusory, that was nothing, really, [for defense counsel] to explore." (Doc. 42, p. 23, lns. 24-25).

We can, of course, never definitively know the depth of the "everything" Mr. Chester actually knew or had been told by law enforcement at the time of the questioning; we have only the transcript and an affidavit given more than five years after the events.  We disagree, however, that *any* of the prosecutor's questions were designed to elicit this information.  After Mr. Chester stated he knew pretty much everything about the case, the prosecutor asked no follow-up questions, did not seek to have Mr. Chester separated for questioning, nor did he ask for any other details.  Instead, he defaulted to defense counsel.  Likewise, we do not find Mr. Chester's statements to be "conclusory," as Respondent suggests.

In this light, what is ultimately important is not whether these responses were "conclusory," but whether they provide evidence of the juror's "prejudice," Irvin v. Dowd, 366 U.S. 717, 725 (1961), or inability to "impartially follow the court's instructions and evaluate the evidence," Morgan v. Illinois, 504 U.S. 719, 730 (1992).  Under Irvin, it is true that "the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is [in]sufficient to rebut the presumption of a prospective juror's impartiality."  Irvin, 366 U.S. at 723.  It is generally sufficient if a juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.  We find the voir dire clearly and convincingly negative on this point.  With Mr. Chester's known

information he indicated that he could not do so when questioned by the prosecution.  He likewise gave no such indication when questioned by defense counsel,[9] as will be seen, following.  Mr. Chester admitted his source of prejudice. As discussed below, "'a juror who has formed an opinion cannot be impartial.'" Id. at 722 (quoting Reynolds v. U.S., 98 U.S. 145, 155 (1878)).  The juror's "verdict must be based upon the evidence developed at the trial.  This is true, regardless of the heinousness of the crime charged [or] the apparent guilt of the offender." Id. (internal citations omitted).  A juror's mind need not be free of preconceived notions, but "the law mandates a juror willing to 'lay aside his impression or opinion and render a verdict based on the evidence presented in court.'"  Virgil v. Dretke, 446 F.3d 598, 613 (5th Cir. 2006) (quoting Irvin, 366 U.S. at 717).  Where every member of a jury panel is not impartial, then the accused has not been convicted by an impartial jury as demanded by the United States Constitution. See id. at 607.

### B.    Defense counsel's questioning and the trial court's acceptance of the juror

In Strickland v. Washington, 466 U.S. 668, 687 (1984), the definitive United States Supreme Court case on inadequacy of defense counsel, the Court set forth the appropriate test:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has

---

[9]  The entirety of this questioning is found in the Court Record, Vol. 3 of 18, pp. 167-71.

two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

The trial transcript contains no information that there was any time break after the prosecutor concluded his questioning resulting in the juror's admission of bias and saying he would "let Mr. Calhoun [defense counsel] explore that." (Court Record, Vol. 3 of 18, p. 167).  Nonetheless, Mr. Calhoun did not "explore that" at all.  Instead, he began by asking Mr. Chester only if he knew the accused, and if he was acquainted with the night club where the robbery and murder took place or with any of the club's owners.  Then, the major part of questioning consisted of discussing whether Mr. Chester had possible scheduling conflicts with the trial and his views on gun control.  Mr. Calhoun never addressed the juror's admitted bias and did not return to the issue raised by the prosecution and left to the defense counsel.

In a relevant aside, the trial judge interrupted defense counsel's questioning of Mr. Chester at one point.  This occurred when Mr. Calhoun asked Mr. Chester about a National Guard drill Mr. Chester had scheduled for the coming weekend with which the trial could interfere.  Mr. Calhoun asked about the drill location, and then "[w]hat kind of exercise" it would be. (Court Record, Vol. 3 of 18, p. 168).

17

The judge interrupted Mr. Chester mid-answer: "What is the relevance of what kind of exercise it is? Let's get to the meat of this case . . . the qualification of this person as a juror." (Id.)  Mr. Calhoun responded by asking the jury be removed so he could make an objection outside of the jury's presence, which the judge allowed.   Once the jury was removed, Mr. Calhoun objected that he had wide latitude to conduct voir dire, and he moved for a mistrial on the basis that the Court's admonishment "not to question the jurors . . . indicates an opinion . . . that my method is improper, that perhaps Mr. Allen is guilty, perhaps we are wasting time with this voir dire process." (Id. at p. 169).  The court replied that its "irritation [was] with irrelevant questions." (Id. at p. 170).  They discussed the issue further, with Mr. Calhoun explaining he wanted to ask about the drill because "this is a crime involving a weapon," so "if [Mr. Chester] is at a range fire exercise, I believe that would be relevant." (Id.).  The court ruled counsel could inquire about the topic, and voir dire resumed.  Mr. Calhoun concluded by asking questions about Mr. Chester's views on gun control.[10]  Mr. Chester's bias is absent from the discussion.

---

[10] This is the entire record of Mr. Chester's voir dire.  The only additional information in this portion of the trial transcript is a notation following defense counsel's questioning – "(BENCH CONFERENCE)" – indicating that a bench conference was held.  (Court Record, Vol. 3 of 18, p. 171).  Following this conference, both defense counsel and the prosecution accepted the juror, and the court swore him in.  The conference was not memorialized in the record transcript, as apparently it was the practice of the trial court to hold its bench conferences off the record.  Accordingly, we do not know what was said at that conference, what issues were addressed, what prompted it, or how long it lasted.  One could speculate that some exchange occurred in this conference that could shed light on the issue before us.  However, "off the record" means off the record; as the content of the conference was not recorded, it cannot be a mitigating factor in this case.

18

Mr. Calhoun did not ask a single question of Mr. Chester about the juror's relationship with the sheriff's deputies, about what information Mr. Chester had acquired from them, or about the opinions he had formed as a result of that information.  The record is silent as to why Mr. Calhoun did this (or, rather, did not).  It does reflect that he was relatively  inexperienced with capital cases.  (See Doc. 23, p. 1).  Petitioner's current counsel sought a statement of explanation from Mr. Calhoun in 2000.  Mr. Calhoun said he "doesn't remember the voir dire of James Chester or why he would have accepted him on the jury."[11]  Respondent likewise provides no explanation, excepting its implausible claim, rejected above, that the juror's statements were only conclusory and so did not invite further exploration.

We find this failure in both not questioning the juror and sitting him on the jury without a clear statement that he could put aside all he had been told about the case violated the Defendant's Sixth Amendment right to a speedy and public trial by an impartial jury, as well as his right to effective assistance of counsel.  See Virgil, 446 F.3d at 607 n. 33 (emphasizing the court's ability to follow up with and rehabilitate a juror following an express admission of bias).  In Virgil, the

---

[11] Mr. Calhoun reportedly made this remark in an interview with Petitioner's present counsel.  The statement is here submitted through an affidavit of a paralegal from counsel's firm (Doc. 15-2), and was discussed at the hearing on this petition.  Respondent did not object, either following the written submission or when it was raised at the hearing.  (Doc. 42, pp. 14-15, lns. 20-25, 1-9).  For the same reasons concerning the affidavit from Mr. Chester, the affidavit of the paralegal is not properly considered at this point.

court held that performance of defense counsel must fall "'below an objective standard of reasonableness.'" Id. at 608 (quoting Wiggins v. Smith, 539 U.S. 510, 521 (2003) (quoting Strickland, 466 U.S. at 688)).   Additionally, the court determined "a 'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." Id. (quoting Johnson v. Dretke, 394 F.3d 332, 337 (5th Cir. 2004)).  The Virgil court found that permitting an admittedly biased juror to judge one's client, "with counsel's lack of response in the face of express statements" by a juror that he could not be fair and impartial, does permeate the entire trial with obvious unfairness so as to constitute "deficient performance under Strickland." Id. at 609-10.

We find that the failure of Petitioner's trial counsel either to explore Mr. Chester's conceded bias and/or even attempt to challenge the juror constitutes ineffective assistance of counsel under the Sixth Amendment and its Strickland standard.  Under Strickland, even when a state court finds competency by defense counsel (unlike here), "a state court's ultimate conclusion that counsel rendered effective assistance is not a fact finding to which a federal court must grant a presumption of correctness under 28 U.S.C. § 2254(d), but instead is a mixed question of law and fact." Bryant v. Scott, 28 F.3d 1411, 1414 (5th Cir. 1994) (quoting Black v. Collins, 962 F.2d 394, 401 (5th Cir. 1992), cert. denied, 504 U.S.

992 (1992)). We "independently decide whether counsel's conduct passes constitutional muster." Id. (citing Nealy v. Cabana, 764 F.2d 1173, 1176-77 (5th Cir. 1985)) (internal footnote omitted).

The inadequacy of defense counsel's performance here is similar to that of the defense counsel in Virgil.  There, a habeas petitioner challenged his conviction on the ground that two jurors expressly stated during voir dire they could not be fair and impartial. One, Mr. Roger Sumlin, had family members who were police officers and who had given the juror certain preconceived notions about the likely culpability of "repeated offenses, a pattern of past behaviors," and "repeated offenders." Virgil, 446 F.3d at 603. The other, Mr. Thomas Sims, had a mother who had been mugged, and the mugger had never been found, an event that kept "crossing [his] mind" and "weighing" on him, as the defendant was on trial for causing injury to an elderly person. Id. at 601, 603-04. When asked if his preconceptions meant he "could not serve as an impartial juror in this case," Mr. Sumlin answered "Perhaps not." Id. at 603.  When further asked "[i]s your answer no or yes," Mr. Sumlin stated, "I would say no." Id. Mr. Sims, when asked if his mother's experience would "cause [him] to be a juror who could not be fair and impartial in this case," stated "Yeah, I believe so." Id. at 604. Neither defense counsel nor the trial court explored these statements of bias further.[12] Defense

---

[12] "At no point during voir dire did counsel attempt to clarify, confirm, or rehabilitate this testimony. Moreover, the trial judge never expressed any concern regarding the statements by the five challenged jurors regarding their ability to be fair." Virgil, 446 F.3d at 604. Our opinion focuses on the statements by Mr. Sims and Mr. Sumlin based

counsel did not challenge the jurors, and both were allowed on the jury which rendered the petitioner's verdict.  Id. at 604.

The Fifth Circuit held "Sumlin and Sims's unchallenged statements during voir dire that they could not be 'fair and impartial' obligated Virgil's counsel to use a peremptory or for-cause challenge on these jurors" and that "[n]ot doing so was deficient performance under Strickland." Id. at 609-10. Notably, the court found this to be true even though petitioner's trial counsel had submitted an affidavit stating that he was "able to question the potential jurors regarding any issues that I thought might arise in this case . . . [and] I struck all persons whom I thought had some type of bias, prejudice or issue based upon my voir dire." Id. at 610.

We liken the voir dire answers of the jurors in Virgil to Mr. Chester's answers in the present case. In Virgil, both jurors eventually responded in the negative to the question of whether they could be fair and impartial, but they did so based on somewhat nebulous feelings of prejudice related to the circumstances of the defendant's case. Id. at 603–04. Similarly, here, Mr. Chester stated he had prejudged Mr. Allen's specific case, based on information from the investigating officers. Mr. Chester did not say he theoretically or generally could not be impartial; rather, he testified he "pretty much kn[e]w everything" and had formed an opinion in the case. (Court Record, Vol. 3 of 18, p. 167). Specifically in regard to his having formed an opinion about the case, Mr. Chester answered: "Well, I

--------

on their similarity to Mr. Chester's statements.

had until I got this summons and then, you know, just . . . ." (Id.). This indicates to us that Mr. Chester's opinion in the case had been formed, and he was unable (or at least not allowed) to state he had or could put this opinion aside if chosen as a juror. Mr. Chester was also asked if he could put his "personal feelings or opinions of the case aside," and he refused, stating that he would use the information he had learned ("it'd just be something else I'd have to put in the pot") and opinion he had formed to reach his final decision. (Id.).  There was nothing nebulous or general about Mr. Chester's bias toward Mr. Allen's guilt.

The only attempt by Respondent now to address this reality is its argument that the specific information learned by Mr. Chester was never ascertained, and it *could* be that all of it was presented at trial. We reject this contention. As discussed above, Mr. Chester stated he "pretty much kn[e]w everything" about the case from his relationship and interaction with the investigative officers. Respondent has presented no evidence, and we are independently unpersuaded, that the information related by those individuals – outside the presence of court or counsel, without the benefit of confrontation – was the same in content and form as what was presented at trial.

The key to the Fifth Circuit's finding in Virgil, and ours, is that the voir dire answers evinced "a showing of bias." Virgil, 446 F.3d at 609. Only in the face of such evidence do we find counsel's failures deficient, and the state court's

acceptance of counsel's failures an objectively unreasonable application of federal law.

> As the court in <u>Virgil</u> noted:
>
>> A showing of constitutionally deficient performance is not sufficient to sustain an ineffective assistance of counsel claim under <u>Strickland</u>. Virgil must traverse two additional burdens: He must establish that counsel's deficient performance prejudiced his defense; then, he must show that the state court's decision to the contrary was an unreasonable application of clearly established federal law as determined by the Supreme Court.

<u>Id.</u> at 611. Just as in <u>Virgil</u>, "we are confronted with a situation in which, due to counsel's failure," a juror expressly stated he could not be fair and impartial; yet this juror was seated on the jury which convicted Petitioner and *sentenced him to death.* <u>Id.</u> at 612. Further, even under <u>Irvin</u>, 366 U.S. at 723, the Supreme Court determined "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  Mr. Chester's statements fail this test.  That this is easily true is shown by example.  What follows is a version of quoted language from <u>Virgil</u>, substituting facts from this case:

> <u>Strickland</u>'s prejudice standard is a well-rehearsed phrase in the inferior federal courts: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984). That prejudice shorthand is guided by principles underlying the Sixth Amendment's right to effective counsel, and it is those principles that the state court's decision–denying [Petitioner's] ineffective assistance of counsel claim–runs afoul of in this case.  See <u>Williams v. Taylor</u>,

529 U.S. 362, 391 (2000) (recognizing that while the <u>Strickland</u>
"reasonable probability" test can resolve "virtually all" claims of
ineffective assistance of counsel, "there are situations in which the
overriding focus on fundamental fairness may affect the analysis").

<u>Strickland</u>'s prejudice inquiry is process-based: Given counsel's
deficient performance, do we have confidence in the process afforded
the criminally accused? "The purpose of the Sixth Amendment
guarantee of counsel is to ensure that a defendant has the assistance
necessary to justify reliance on the outcome of the proceeding."
<u>Strickland</u>, 466 U.S. at 691-92; <u>Nix v. Whiteside</u>, 475 U.S. 157, 175
(1986) (noting that under <u>Strickland</u>, the "benchmark" of the right to
counsel is the "fairness of the adversary proceeding"); <u>Kimmelman v.
Morrison</u>, 477 U.S. 365, 374 (1986) ("The essence of an
ineffective-assistance claim is that counsel's unprofessional errors so
upset the adversarial balance between defense and prosecution that
the trial was rendered unfair and the verdict rendered suspect."); <u>see
also</u> <u>Williams</u>, 529 U.S. at 393 ("Cases such as <u>Nix</u> and <u>Lockhart v.
Fretwell</u>, 506 U.S. 364 (1993) do not justify a departure from a
straightforward application of <u>Strickland</u> when the ineffectiveness of
counsel does deprive the defendant of a substantive or procedural
right to which the law entitles him."). Prejudice is presumed in a
narrow category of cases, none of which are present here.  <u>United
States v. Cronic</u>, 466 U.S. 648, 659 & n. 25 (1984) (detailing
situations in which prejudice should be presumed); <u>Strickland</u>, 466
U.S. at 692; <u>Bell v. Cone</u>, 535 U.S. 685, 694-98 (2002).  Absent
mechanical rules, "the ultimate focus of the inquiry must be on the
fundamental fairness of the proceeding whose result is being
challenged." <u>Strickland</u>, 466 U.S. at 696.  We focus on ferreting out
"unreliable" results caused by "a breakdown in the adversarial
process that our system counts on to produce just results." <u>Id.</u>; <u>see
also</u> <u>id.</u> at 697 ("An ineffectiveness claim ... is an attack on the
fundamental fairness of the proceeding whose result is challenged.").
Guiding our prejudice inquiry, the Supreme Court requires lower
federal courts to "presume" that "the judge or jury acted according to
law." <u>Id.</u> at 694-95.  Most importantly for our purposes, "The
assessment of prejudice should proceed on the assumption that the
decisionmaker is reasonably, conscientiously, and *impartially*
applying the standards that govern the decision." <u>Id.</u> at 695
(emphasis added).  Even according the state court the deference
warranted under AEDPA, these basic principles, encapsulated in
<u>Strickland</u>'s well-worn prejudice standard, were unreasonably applied

25

by the state court when it denied [Petitioner's] ineffective assistance of counsel claim.

Here, we are confronted with a situation in which, due to counsel's failure, [one] person[], expressly stating that [he knew of the case, was consequently biased, and would be unable to set aside that bias in rendering a decision], found [himself] seated on the petit jury that convicted [Petitioner] and sentenced him to [death].  We are required to presume "that the judge or jury acted according to law," Strickland, 466 U.S. at 694-95, yet the law mandates a juror willing to "lay aside his impression or opinion and render a verdict based on the evidence presented in court."  Irvin v. Dowd, 366 U.S. 717, 723 (1961).  That did not occur here. Given the fundamental nature of the impartial jury and the consistent line of Supreme Court precedent enforcing it, we must conclude that "the result of [Petitioner's] trial is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results."  Strickland, 466 U.S. at 696.

Such an unreliable result dictates the conclusion that [Petitioner's] defense was prejudiced under Strickland by the sitting of [Mr. Chester, who] unequivocally expressed [he] could not sit as [a] fair and impartial juror[], and the state court's decision to the contrary cannot stand.  As [the Fifth Circuit] stated in United States v. Nell, "The jury box is a holy place."  526 F.2d 1223, 1229 (5th Cir.1976). Our criminal justice system is predicated on the notion that those accused of criminal offenses are innocent until proven guilty and are entitled to a jury of persons willing and able to consider fairly the evidence presented in order to reach a determination of guilt or innocence. [Petitioner] was denied these basic principles when [a] juror[] expressed [his] inability to serve fairly and impartially in his case. Had [Petitioner's] counsel challenged for cause [that juror], the trial judge would have been forced to rule, a ruling that counsel could have objected to and pursued as error on direct appeal.  There is little doubt that such an error would have been sustained by the [Louisiana] courts on direct review. [See La. Code Crim. Proc. art. 797(2) (providing a for-cause challenge to a venireperson who "is not impartial."; Louisiana v. Taylor, 781 So.2d 1205, 1213 (La. 2001); Louisiana v. Maxie, 653 So.2d 526, 534-35 (La. 1995)].

The process-failure in this case stems as much from the unknown as from the known.  No effort was made to explore the depth or intensity

of [Mr. Chester's] bias toward [Petitioner]. [After Mr. Chester expressly told the prosecution he could not put aside his bias and decide the case solely upon the evidence presented in court, defense counsel did not ask a single question on this topic].  Furthermore, we cannot know the effect [Mr. Chester's] bias had on the ability of the remaining [] jurors to consider and deliberate, fairly and impartially, upon the testimony and evidence presented at [Petitioner's] trial. Each ultimate juror in this case heard [Petitioner's] biased statements during voir dire; each watched as [Petitioner's] representative failed to make any comment in response.

Taken together, we must say that we lack confidence in the adversarial process that resulted in [Petitioner's] felony conviction and [death] sentence. [Mr. Chester] unequivocally expressed [his] inability to serve as [a] fair and impartial juror[] in [Petitioner's] case. No peremptory challenge was used; no challenge for cause attempted. By law, [Petitioner] was prejudiced by the presence of partial jurors in violation of his Sixth and Fourteenth Amendment rights, and we consider the state court's decision to the contrary [which did not consider this issue on the merits because of its interpretation of Louisiana Rule of Evidence 606(B)] to be an unreasonable application of clearly established Federal law as determined by the Supreme Court.  Expressed in <u>Strickland</u> terms, the deficient performance of counsel denied [Petitioner] an impartial jury, leaving him with one that could not constitutionally convict, perforce establishing <u>Strickland</u> prejudice with its focus upon reliability.

<u>Virgil</u>, 446 F.3d at 611-14.

VII.   **The Summary Judgment Motion**

In his Report and Recommendation on summary judgment (Doc. 33), the Magistrate Judge erred when indicating there was no summary judgment in habeas cases.  That error was appropriately pointed out and correctly briefed by Allen's present counsel (Doc. 34).   In this instance, however, it makes little difference, for the result on summary judgment and the relief being granted by the Court are the same.

27

## VIII.  **The Affidavit Issue**

As we have observed, the principal evidence here is the transcript of the

juror's voir dire.  For clarity, we emphasize that evidence alone is sufficient for our

ruling.  At this juncture, however, we must also address the affidavit Petitioner's

counsel obtained from the juror more than five years after conclusion of the trial.

It must be addressed because it was a touchstone of the state's post-conviction

relief denial and the Magistrate Judge's Report and Recommendation.

The affidavit reads, in relevant part, as follows:

> In October 1994 I served as a juror in the case of <u>State of Louisiana</u>
> <u>v. Willard Allen</u>.
>
> Prior to and after the time that I served on the jury in this case, I
> worked as a firefighter with the Natchitoches Parish Fire District.  I
> was well-acquainted with and socialized with deputies with the
> Natchitoches Parish Sheriff's Office.  I also played softball with many
> of these deputies, and knew two of them – Deputies Lamar McGaskey
> and Victor Jones particularly well.
>
> * * *
>
> Because I regularly socialized with the Sheriff's Office deputies, prior
> to October 1994 I learned information from them regarding the
> Herman Ferguson murder and investigation.   This information
> influenced my opinion of the case.
>
> As a result, prior to my service on the <u>Willard Allen</u> jury, I formed an
> opinion that Mr. Allen deliberately and intentionally robbed and killed
> Herman Ferguson.  I made up my mind that this was true prior to
> being selected for the jury.
>
> During the jury selection phase, I spoke with other members of the
> jury venire about the case.  I told several of these individuals that I
> had spoken with deputies about the case, and that I believed Mr.
> Allen was guilty.  I specifically recall that certain of these individuals
> were later seated and served on the jury.

28

> When [the prosecutor] finished questioning me, and tendered me to Mr. Calhoun, I was surprised that Mr. Calhoun did not inquire further into the opinion that I had stated that I had formed about Mr. Allen's guilt.
>
> I was also completely surprised to hear that I had been selected to sit on the Willard Allen jury. I recall that my reaction that I had been selected was amazement. Other jury venire members in the courtroom that morning actually laughed when the announcement was made that I had been selected.

(Doc. 1-2, pp. 126-27).

As said, this affidavit was taken more than five years after trial. Its formality and clarity stand in contrast to Mr. Chester's undeveloped oral statements during voir dire.

In all, Mr. Chester's affidavit does not disavow his voir dire answers or present an interpretation of those answers at odds with a natural reading of them. Instead, it purports to confirm precisely what one would reasonably conclude from reading his voir dire answers – he was unable to be impartial, he judged the case on evidence not presented at trial, and he should not have been on the jury.

Unlike the voir dire answers, this affidavit was addressed in the state court's post-conviction habeas decision. (Doc. 1-1, pp. 63-64). That decision found the affidavit inadmissible under Louisiana Rule of Evidence 606(B). Specifically, it held, "only affidavit or witness testimony that concerns either outside influences or extraneous prejudicial information is admissible in this proceeding." (Doc. 1-1, p. 63). It found that none of Mr. Chester's claims involve outside influences, so it refused to consider the affidavit's "egregious allegations." (Doc. 1-1, pp. 62-63).

Here, Respondent adopts the same position, claiming that the rules of evidence[13] made the affidavit inadmissible in the state habeas proceedings and prevent our consideration of it here.  (Doc. 42, p. 21, ln. 8 *et seq*).

Whether a state court interpreted a (state) evidentiary rule correctly is generally not of concern to a federal court on habeas.  See Panzavecchia v. Wainwright, 658 F.2d 337, 340 (5th Cir. 1981).

Under Federal Rule of Evidence 606(b), the portions of the affidavit quoted above might have been properly considered.  Until 2011 (at all times relevant to this proceeding), Rule 606(b)[14] provided in pertinent part:

> [A] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

By its terms, Rule 606(b) thus does not bar "juror testimony on matters *unrelated* to the jury's deliberations." Tanner v. U.S., 483 U.S. 107, 137-38 (1987).  "Even as to matters involving deliberations, the bar is not absolute," as the rule

---

[13] Respondent said that the Rule – Louisiana Rule of Evidence 606(B) or Federal Rule of Evidence 606(b) – "is essentially the same from state to state and [in the] federal rules." (Doc. 42, p. 21, ln. 8 *et seq*).

[14] Rule 606(b) was amended in 2011 for stylistic reasons only, with no intent to vary the content.

"expressly authorizes jurors to testify as to 'extraneous prejudicial information' or 'outside influence.'" Id. at 138 & n. 6 (quoting Rule 606(b)); see also Fed. Rule Evid. 606(b)(2).  In all, the rule prohibits testimony or affidavits only as to:

> (i) any "matter or statement" occurring during deliberations; (ii) the "effect" of anything upon the "mind or emotions" of any juror as it relates to his or her "assent to or dissent from the verdict"; and (iii) the "mental processes" of the juror in connection with his "assent to or dissent from the verdict."   Even as to matters involving deliberations, the bar is not absolute.FN6

> FN6 Rule 606(b) expressly authorizes jurors to testify as to "extraneous prejudicial information" or "outside influence."

Tanner, 483 U.S. at 138; see also U.S. v. Ortiz, 942 F.2d 903, 913 (5th Cir. 1991) ("[T]he rule separately bars juror testimony regarding at least four topics: (1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mindset or emotions of any juror during deliberation, and (4) the testifying juror's own mental process during the deliberations.").

Although the text of the two rules is similar, the state court's view that it could only consider either outside influences or extraneous prejudicial information is plainly different from the federal view.  Thus, while we may significantly disagree with the state court's interpretation of its own evidentiary rule, disagreement is not a constitutional basis to override that interpretation.  As we observed above, we are constrained in such a situation by Williams v. Taylor, 529 U.S. 362, 409 (2000), and its progeny only to those constitutional applications

31

that are "objectively unreasonable."  We cannot say that the state court's interpretation of admissibility, while strained in our view, is objectively unreasonable as a matter of law.  We thus reject Petitioner's argument to that effect.

IX.   **Conclusion**

For the foregoing reasons, the petition under 28 U.S.C. § 2254 for writ of habeas corpus (Doc. 1) will be GRANTED, and this matter will be REMANDED to the Tenth Judicial District Court for the Parish of Natchitoches, Louisiana with instructions to conduct its own bail hearing within forty-five (45) days of the accompanying judgment. Petitioner's motion for summary judgment (Doc. 27) will likewise be GRANTED. The State of Louisiana shall retry Petitioner within two hundred seventy (270) days of the accompanying judgment; otherwise, the State shall unconditionally discharge Petitioner from custody. Disposition will enter by a separate judgment signed on this date.

SIGNED on this *13* day of February, 2014 at Alexandria, Louisiana.

DEE D. DRELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

32